[Cite as *State v. Anderson*, 2012-Ohio-3663.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

v.

PERNELL V. ANDERSON

    Appellant

C.A. No.    26006

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR 11 03 0604

DECISION AND JOURNAL ENTRY

Dated: August 15, 2012

---

BELFANCE, Judge.

{¶1}  Defendant-Appellant Pernell Anderson appeals from the judgment of the Summit County Court of Common Pleas.  For the reasons set forth below, we reverse.

I.

{¶2}  On March 8, 2011, an indictment was filed charging Mr. Anderson with one count of burglary in violation of R.C. 2911.12(A)(2), a felony of the second degree and one count of possessing criminal tools in violation of R.C. 2923.24, a felony of the fifth degree.  A supplemental indictment was later filed charging Mr. Anderson with one count of breaking and entering in violation of R.C. 2911.13(A), a felony of the fifth degree.  The charges at issue relate to a break-in at a condemned house on March 4, 2011.

{¶3}  The matter proceeded to a bench trial. The trial court found Mr. Anderson guilty of the lesser included offence of burglary, a third-degree felony and of breaking and entering. The trial court specifically found that "the State did not prove beyond a reasonable doubt that

any person other than the accomplice or the defendant were present or likely to be present[.]" The trial court found Mr. Anderson not guilty of possession of criminal tools.

{¶4} The trial court found the burglary and breaking and entering charges merged for purposes of sentencing and sentenced Mr. Anderson to a total of four years in prison. Mr. Anderson has appealed, raising two assignments of error for our review.

II.

ASSIGNMENT OF ERROR I

THE TRIAL COURT'S DECISION TO FIND THE ACCUSED GUILTY OF BURGLARY, IN VIOLATION OF R.C. 2911.12(A)(3), IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶5} Mr. Anderson asserts in his first assignment of error that his conviction for burglary is against the manifest weight of the evidence. He solely asserts that the determination that the condemned house at issue was an occupied structure was against the manifest weight of the evidence. Nonetheless, a review of the weight of the evidence necessarily involves an evaluation of the sufficiency of the evidence in that, in order for this Court to weigh the evidence, there must be evidence to weigh. *See State v. Recklaw,* 9th Dist. No. 24078, 2008-Ohio-5444, ¶ 14. In reviewing the record in this case, we conclude that there was insufficient evidence to establish that the house at issue was an occupied structure. Accordingly, Mr. Anderson's conviction for burglary is based upon insufficient evidence.

{¶6} In determining whether the evidence presented was sufficient to sustain a conviction, this Court reviews the evidence in a light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259, 274 (1991). Furthermore:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is

whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus.

{¶7} Officer William Meier of the Akron Police Department testified that, on March 4, 2011, he responded to a call of a burglary in progress at 797 Crestview. When he arrived at the location, Officer Meier observed a chair propped against an open window on the east side of the house. The officers proceeded through the house. Officer Meier noted that the house was furnished but cluttered and there were several cats running around. He stated that "[i]t appeared lived in * * * ." In the last room to be checked, Officer Meier testified that there was a pile of clothes on the bed, under which Mr. Anderson was hiding. Mr. Anderson had a screwdriver in his pocket. Additionally, cell phones and jewelry were found on Mr. Anderson's person. After being Mirandized, Mr. Anderson told police that he had a habit, had gone out drinking, and that he broke into the house "to take some items." Further, Mr. Anderson told police that he had put some frozen meat from the freezer by the front door to take with him when he left. A jewelry box was found in the yard.

{¶8} The owner of the house also testified. She testified that she bought the house in 1979 and that as of the date of trial she still received mail at that address. However, the last time the victim spent the night and/or resided in the house was during the prior year in November 2010. She indicated that she had to move out because the house had no heat as of May 2010. She maintained that she keeps personal items in the bedroom in that house and that she returns to the house every other day or once a week to feed the cats. However, the victim sleeps, eats all her meals, does laundry, and bathes at her daughter's house. The victim testified that she had had ongoing issues with the Health Department concerning the house for several years. She

asserts that the house does not have all the problems that the city claims and that her house is nice. The victim claimed that she intended to move back in after the house was repaired; however, she did not have the funds necessary to have people clean out the basement which was necessary to do before any of the agencies were willing to come in to help her. The victim indicated that a "levy broke in [her] yard[,]" causing four feet of water to pool in her basement, which in turn led to mold problems. Because of the mold problems, she cannot clean out basement herself but instead needs to enlist the help of professionals, which she cannot afford to do. And, while the house had electricity, it had no heat and no running water. The victim was aware that the city condemned her house in February 2011, in a notice which found the house to be "unfit for human habitation." In addition, the city was trying to have the structure demolished. Despite this fact, the victim testified she was allowed into the home during the day.

{¶9} Finally, Kathy Graves who conducts residential housing inspections for the City of Akron testified. She testified that she has inspected the outside of the victim's house but not the inside as she has never been given access to the inside.[1] She testified that an initial complaint was filed against the property in 2006. She described the victim as uncooperative and stated that repairs were not being made. She averred that the house is uninhabitable and that she posted the house as condemned in February 2011 because there was no water. Ms. Graves' report from February 2011 listed 32 line items. Inter alia, the report states: "Do not enter dwelling unit except between the hours of 7:00 a.m. and 7:00 p.m. for the specific purpose of repairing the

---

[1] From the record, it is evident that someone other than Ms. Graves did inspect the interior of the house at some point in time prior to her involvement.

dwelling[.]" Ms. Graves testified that she conducted the February 2011 inspection after her office received a letter from an agency. The letter stated that the agency "won't assist [the victim] because of interior conditions. No heat, no hot water. Owner has abandoned the house and is now living with her mother. The water has been shut off as of 1/11/11." The city has taken steps to try to have the house demolished, although no demolition order was in place at the time of trial; Ms. Graves plans to recommend to the Housing Appeals Board that the house be demolished. Because the victim has failed to comply with fixing the items listed in Ms. Graves' report, there was a bench warrant out for the victim's arrest at the time of trial.

{¶10} R.C. 2911.12(A)(3) provides that "[n]o person, by force, stealth, or deception, shall * * * [t]respass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, with purpose to commit in the structure or separately secured or separately occupied portion of the structure any criminal offense."

> "Occupied structure" means any house, building, outbuilding, watercraft, aircraft, railroad car, truck, trailer, tent, or other structure, vehicle, or shelter, or any portion thereof, to which any of the following applies:
>
> (1) It is maintained as a permanent or temporary dwelling, even though it is temporarily unoccupied and whether or not any person is actually present.
>
> (2) At the time, it is occupied as the permanent or temporary habitation of any person, whether or not any person is actually present.
>
> (3) At the time, it is specially adapted for the overnight accommodation of any person, whether or not any person is actually present.
>
> (4) At the time, any person is present or likely to be present in it.

R.C. 2909.01(C); *see also* R.C. 2911.12(C).

{¶11} We note that the trial court specifically found that the State failed to prove that anyone was present or likely to be present. *See* R.C. 2909.01(C)(4). The parties do not challenge this finding.

**{¶12}** The only other provision of the statute that arguably applies to the facts of the instant matter is R.C. 2909.01(C)(1). Thus, we turn our analysis to examining that provision.

**{¶13}** In the often-cited case of *State v. Green*, 18 Ohio App.3d 69 (10th Dist.1984), the Tenth District discussed the definitions of occupied structure under a former, substantively similar version of the statute, and, in so doing, paid particular attention to the Committee Comments regarding the statute. The *Green* court reasoned that:

> [i]t is obvious that the General Assembly, in adopting the definition of "occupied structure" found in R.C. 2909.01, intended to broaden the concept of the offense of burglary from one of an offense against the security of habitation, to one concerned with the serious risk of harm created by the actual or likely presence of a person in a structure of any nature. In that context, it is noteworthy that the General Assembly utilized the word "maintained" in division (A), as opposed to "occupied," although it did use that latter word in division (B), which deals with structures other than dwellings. We believe that the distinction between "maintained" and "occupied" is significant, in the sense that the former alludes more to the character or type of use for which the dwelling is intended to be subjected, whereas the latter is more closely related to the actual use to which the structure is presently being subjected.
>
> Thus, a structure which is dedicated and intended for residential use, and which is not presently occupied as a person's habitation, but, which has neither been permanently abandoned nor vacant for a prolonged period of time, can be regarded as a structure "maintained" as a dwelling within the meaning of division (A). In this context, then, division (A) includes a dwelling whose usual occupant is absent on prolonged vacation, a dwelling whose usual occupant is receiving long-term care in a nursing home, a summer cottage, or a residential rental unit which is temporarily vacant. In all these examples, even though the dwelling is not being presently occupied as a place of habitation, that situation is temporary, and persons are likely to be present from time to time to look after the property-to help "maintain" its character as a dwelling.

*Id.* at 71-72. In cases subsequent to *Green*, courts have relied on it, and/or the Committee Comments, to conclude that various structures at issue were occupied structures within the meaning of the statute despite the fact the residence was undergoing restorations and/or was temporarily vacant for various reasons. *See, e.g., State v. Davis,* 8th Dist. No. 90050, 2008-Ohio-3453, ¶ 44; *State v. Burgos,* 9th Dist. No. 05CA008808, 2006-Ohio-4305, ¶ 11, 22-24;

*State v. Jackson,* 12th Dist. Nos. CA2005-02-033, CA2005-03-051, 2006-Ohio-1147, ¶ 29-33; *State v. Charley,* 8th Dist. No. 82944, 2004-Ohio-3463, ¶ 68-72; *State v. Tornstrom,* 8th Dist. No. 72898, 1998 WL 811314, *10-11 (Nov. 19, 1998); *State v. McLemore,* 9th Dist. No. 95CA006037, 1995 WL 515477, *2-*3; *State v. Bock,* 16 Ohio App.3d 146,149-150 (12th Dist.1984).

{¶14} Nonetheless, we conclude that this case is distinguishable from the above cases. We note that we have been unable to locate a case matching these precise facts. The problem with concluding that this house was "maintained as a permanent or temporary dwelling," is that the house was clearly not being "maintained" in any sense of the common meaning of the word. R.C. 2909.01(C)(1). The house was posted as condemned, and the city actively sought to have it demolished. It was listed in the city's report as uninhabitable and described in a letter to the city as abandoned. Repairs were not being done and, given the financial resources of the victim and the extent of the damage, which required professional assistance to remedy, there was no evidence to conclude that repairs would ever be made. The evidence does not support the conclusion that the house was only temporarily vacant or temporarily uninhabitable. The dissent concludes that the house is an occupied structure under R.C. 2909.01(C)(1) because the continuing purpose of the house is residential. While that certainly *was* the house's purpose, it can no longer be said that that such is the house's purpose when no one can lawfully reside in the house and the evidence does not support the conclusion that it is temporarily unoccupied due to ongoing restoration or repairs. There was no evidence that the victim was maintaining the home as a permanent or temporary dwelling given that she left the home to reside with her daughter, that she could not be there from 7 p.m. to 7 a.m., that she could only be in the home to make repairs, and that she was unable to maintain it as her dwelling through making the necessary

repairs to render it habitable. Although the victim may have continued to store her personal items at the residence, she was not *maintaining* the home as a permanent or temporary dwelling. Given the evidence presented, it is unreasonable to conclude that a structure that was uninhabitable at the time of trial and which was not under repair to make it habitable can be said to be maintained as a dwelling notwithstanding its former purpose. Even when the evidence is viewed in a light most favorable to the prosecution, the evidence does not support the conclusion that the house was an occupied structure as the term is defined in R.C. 2909.01(C)(1)/former R.C 2909.01(A).

{¶15} In light of the foregoing, we conclude there was insufficient evidence to conclude that the house at issue was an occupied structure as defined by R.C. 2909.01(C). Thus, Mr. Anderson's conviction for burglary is based upon insufficient evidence. As our determination bars Mr. Anderson's retrial on this charge, *see State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997), Mr. Anderson's assignment of error has been rendered moot. *See* App.R. 12(A)(1)(c).

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN FINDING THE ACCUSED GUILTY OF
BOTH BURGLARY AND BREAKING AND ENTERING.

{¶16} Mr. Anderson asserts in his second assignment of error that the trial court erred in finding him guilty of both burglary and breaking and entering, as the crimes are mutually exclusive. However, in light of our resolution of Mr. Anderson's first assignment of error, we conclude this assignment of error is moot. *See* App.R. 12(A)(1)(c).

## III.

{¶17} In light of the foregoing, we conclude that Mr. Anderson's conviction for burglary is based on insufficient evidence. Thus, the judgment of the Summit County Court of Common Pleas is reversed.

Judgment reversed,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

EVE V. BELFANCE
FOR THE COURT

DICKINSON, J.
CONCURS.

MOORE, P. J.
DISSENTING.

{¶18} As I believe that the evidence, when viewed in the light most favorable to the State, is sufficient to support Anderson's conviction of burglary, I respectfully dissent.

{¶19} In *Green*, referenced by the majority, the Tenth District determined that a structure "maintained as a permanent or temporary dwelling" is one which is "dedicated and intended for residential use, * * * which has neither been permanently abandoned nor vacant for a prolonged period of time[.]" *Id.* at 71, 72. Thus, the *Green* Court focused upon the continuing *purpose* of the structure in determining whether it was one "maintained as a dwelling." Likewise, this Court in the past has also focused upon the continuing purpose of a structure in making a determination as to whether it is "maintained as a dwelling" within the meaning of R.C. 2909.01(C)(1). *See State v. Craig*, 9th Dist. No. 18350, 1998 WL 161285, * 3 (Apr. 8, 1998) (quoting Committee Comment to former R.C. 2909.01 for the proposition that "[w]hether or not the dwelling is *used* as a permanent or temporary home is immaterial, so long as it is *maintained* for that purpose. Thus the definition includes not only the mansion on Main Street, but also the summer cottage, and the tin shack in the hobo jungle." (Emphasis added.)), *State v. Burgos*, 9th Dist. No. 05CA008808, 2006-Ohio-4305, ¶ 21 ("The relevant question in determining if a structure is 'occupied' concerns the residential purpose of the dwelling[.]"), *State v. Merriweather*, 9th Dist. No. 97CA006693, 1998 WL 239773, *5 (May 6, 1998) (apartment used by police as a surveillance post was "maintained as a * * * dwelling"), and *State v. McLemore*, 9th Dist. No. 95CA006037, 1995 WL 515477, *3 (Aug. 30, 1995) (duplex unit was "maintained as a * * * dwelling" although tenant had not resided there for three weeks prior to date at issue and the unit had been sealed by police).

{¶20} I do not believe that the condemnation notice was determinative of whether Ms. Miller's house was "maintained as a dwelling." Further, while I would agree that the evidence was insufficient to demonstrate that, at the time of the offense, Ms. Miller was occupying the home as her habitation, I believe there was sufficient evidence to demonstrate that she was

*maintaining* the home *as a dwelling*. The testimony adduced at trial demonstrated that Ms. Miller returned to her house on at least a weekly basis, she cared for her pets at the house, she kept belongings at the house, she had food at the house, her clothing was hung in the house, she maintained electricity service to the house, she received her mail at the house, she actively sought assistance to repair the home, and she intended to return to her house on a full-time basis. These actions constitute Ms. Miller's continuing maintenance of the structure as that of a dwelling.

{¶21} I believe that the majority's approach combines the alternate bases upon which an "occupied structure" may be proven into the single inquiry of whether the property was used as a habitation at the time of the offense. *See* R.C. 2909.01(C)(1) and (C)(2). Although I would agree that Ms. Miller did not live at the house at the time of the offense, it is clear that her actions pertaining to the house demonstrate that she maintained it as a dwelling. Viewed in this light, the City's, this Court's, and even Ms. Miller's determinations as to the present *habitability* of the house are of limited value in the determination of whether the home was *maintained as a dwelling*. *See Green*, 18 Ohio App.3d at 71-72 ("We believe that the distinction between 'maintained' and 'occupied' is significant, in the sense that the former alludes more to the character or type of use for which the dwelling is intended to be subjected, whereas the latter is more closely related to the actual use to which the structure is presently being subjected.")

{¶22} Therefore, viewed in the light most favorable to the State, a reasonable trier of fact could determine that the continuing purpose of the house was that of a dwelling, and it was neither vacated nor abandoned for a prolonged period of time, notwithstanding the status of condemnation. Accordingly, I disagree with the majority's determination that the evidence was insufficient to support Anderson's conviction. Further, having reviewed the record, I would

conclude that his conviction was not against the weight of the evidence and overrule his assignment of error.

APPEARANCES:

GREGORY A. PRICE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.